Carl LUSK and wife, Helen Lusk, Plaintiffs-Appellants,

v.

JIM WALTER HOMES, INC., Defendant-Appellee.

Supreme Court of Tennessee, at Nashville.

March 28, 1983.

Jerre M. Hood, Robert L. Huskey, Manchester, for plaintiffs-appellants.

William M. Foster, Chattanooga, for defendant-appellee.

OPINION

HARBISON, Justice.

After a jury trial in circuit court, appellants, Carl Lusk and wife, Helen Lusk, were held liable to their son Glenn Lusk and his wife, Carolyn Lusk, for $11,000 damages for breach of covenants against encumbrances in a deed which they gave to Glenn and his wife.

In the same action appellants filed a third-party claim against Jim Walter Homes, Inc., for indemnification if they should be held liable to the grantees of their deed for breach of covenants. The jury found in favor of appellants and awarded them indemnification against Jim Walter Homes, Inc., appellee here, for the sum of $11,000.

Appellee had moved for directed verdict at the trial, but this motion was overruled at the conclusion of all the evidence. Thereafter appellee filed a post-trial motion pursuant to Rule 50.02, T.R.C.P., for a directed verdict or, in the terms of modern practice and procedure, for a judgment notwithstanding the verdict.[1]

No motion for a new trial was filed, nor was any other relief from the judgment sought except that of dismissal as a matter of law.

The trial judge sustained the motion for judgment notwithstanding the verdict and dismissed the third-party action. There is no indication in the record that in his capacity as thirteenth juror he disapproved the verdict as to amount or otherwise. Therefore, if he erred in his legal conclusion, there is no necessity for this Court to remand for a new trial.

The Court of Appeals affirmed the judgment of the trial court, both courts holding that there was no legal basis for indemnification of the grantors, appellants here, upon tort principles. Also both courts held that there was neither an express nor an implied contract of indemnification between appellants and appellee.

■ With respect to the latter conclusion, we respectfully disagree. It seems to us that a jury issue was clearly presented as to whether or not Jim Walter Homes did or did not agree to remove a prior encumbrance upon the property which appellants later deeded to their son so as to clear their son's title. There was positive testimony from appellants and from other witnesses that authorized representatives of appellee stated that a right-of-way which appellants had granted to appellee in a deed of trust was not necessary, that its inclusion in the deed of trust was a mistake and that appellee would be responsible for correcting the error. This testimony, if accepted by the jury, in our opinion reflects an undertaking on the part of appellee to clear title to the property which appellants had deeded to their son. Out of the relationship between appellants and appellee and the agreement to rectify a mistake, in our opinion, there was implied an obligation on the part of appellee to indemnify appellants in the event appellee failed in its undertaking.

The testimony in the case was conflicting. There was material evidence from which the jury could have resolved the issues either way. They found in favor of appellants. On appeal, of course, we must view the evidence in its light most favorable to the verdict, and not in its most favorable aspect toward appellee.

The transactions between the parties arose out of a somewhat complicated series of real estate conveyances in the latter part of 1977 and the early part of 1978. The pertinent facts with respect to these transactions were adequately summarized in the opinion of the Court of Appeals as follows:

"Carl and Helen Lusk owned a tract of land on the Cat Creek Road in Coffee County, Tennessee. Carl, Helen, and their two sons, Glenn Lusk and Howard Lusk, decided they would all build homes on the Cat Creek Road tract.

1. This terminology was not used in the drafting of the Rules of Civil Procedure because of an earlier, rarely used proceeding by the same name which dealt only with pleadings in civil actions and was not equivalent in any way to the consideration after trial of a directed verdict. *See Caruthers' History of a Lawsuit* § 391 (8th ed., S.B. Gilreath and B.R. Aderholt, 1963). Because the older proceeding was abandoned in the Rules of Civil Procedure, this Court has subsequently approved usage of the term "judgment notwithstanding the verdict" in referring to a post-trial motion for directed verdict. *Holmes v. Wilson,* 551 S.W.2d 682 (Tenn.1977).

"In January, 1977, Glenn Lusk had a portion of the tract surveyed which contained .54 acre. The surveyor set stakes to show the boundaries of the proposed .54 acre tract. Nothing further was done.

"On November 29, 1977, Carl and Helen Lusk executed a deed to their son, Howard, conveying 1.2 acres of the Cat Creek Road property. This deed was recorded on the same date.

"On January 9, 1978, a deed of trust from Carl and Helen Lusk to secure a note to Jim Walter was recorded in the Register's Office of Coffee County, Tennessee.

"On February 27, 1978, Carl and Helen Lusk executed and delivered a deed to Glenn and Carolyn Lusk for the .54 acre tract. This deed was recorded in the Register's Office of Coffee County on the same date.

"Jim Walter contracted with both Carl Lusk and Howard Lusk to build homes for them on their property.

"While the record is not absolutely clear, it seems that construction had started on both the Carl Lusk and Howard Lusk homes before delivery of the deed to Glenn Lusk.

"Included in the property conveyed to Howard Lusk was a forty-foot-wide strip from Cat Creek Road across other lands of Carl and Helen Lusk leading to the main property conveyed to Howard Lusk.

"Included in the property conveyed by the deed of trust was an additional forty-foot strip west of and adjacent to the forty-foot strip included in the Howard Lusk deed. The descriptions contained in both the deed to Howard Lusk and the deed of trust made by Carl and Helen Lusk were prepared from descriptions contained in surveys made by employees of Jim Walter.

"Both conveyances, including the total of the eighty-foot strip, were recorded prior to the deed from Carl and Helen Lusk to Glenn and Carolyn Lusk.

"In early February, 1978, prior to the deed from Carl and Helen to Glenn and Carolyn Lusk, Carl received a copy of the survey made by the Jim Walter employees which showed the two forty-foot strips, one leading to the Howard Lusk property and one leading to the Carl Lusk property. Carl then contacted John Lindsay, a Jim Walter employee, who told Carl that there should have been only one forty-foot strip. Lindsay then took his pen and crossed out the westernmost forty-foot strip on the survey. This forty-foot strip was not reconveyed to Carl and Helen and at all times remained of record.

"Subsequently, Carl conveyed the .54 acre to Glenn which contained the westward forty-foot strip which had already been conveyed in the deed of trust.

"Glenn and Carolyn Lusk thereafter obtained a loan from First National Bank of Manchester, Tennessee, in the amount of $23,400 to finance the construction of a home on the .54 acre tract. A title search on behalf of First National Bank was made but failed to disclose the westward forty-foot overlap.

"While the Glenn and Carolyn Lusk home was being constructed, the properties of both Howard Lusk and Carl and Helen Lusk were foreclosed. The loan from the First National Bank was a temporary loan due on or before January 5, 1979, and was secured by a deed of trust on the Glenn Lusk property. Permanent financing was to be furnished by the Home Federal Savings and Loan Association. The construction of the Glenn Lusk home was completed and Home Federal employed attorney Jack Glandon to do a title search. Mr. Glandon in the course of his title examination found that the westward forty-foot strip overlapped the Glenn Lusk property and that, in fact, the Glenn Lusk home was built partially on the forty-foot strip. Home Federal was therefore unwilling to provide permanent financing unless the forty-foot

strip was conveyed to Glenn and Carolyn Lusk.

"Glenn and Carolyn Lusk made several attempts to obtain a release of the forty-foot strip but were unable to do so. The First National note became due, permanent financing could not be arranged, and First National foreclosed.

"At trial, there was proof that the Glenn Lusk home had a fair market value of some $35,000 and that the indebtedness was $24,000. The jury found that Glenn and Carolyn Lusk had suffered damages in the sum of $11,000."

Attached to the Court of Appeals opinion was a schematic diagram of the properties involved, which we have duplicated and included as an appendix hereto.

There were several additional material facts not referred to by the Court of Appeals. Not only were the critical surveys in this case prepared by employees of appellee, but the legal instruments under which appellants deeded property to their son Howard Lusk (including one forty-foot strip of land) and the deed of trust by which appellants encumbered their property to appellee (which included another forty-foot strip) were also prepared by attorneys and employees of Jim Walter Homes, Inc.

There is also abundant testimony from appellants and from a bank official who had handled the temporary financing that representatives of appellee told appellants and the bank officer that a mistake had been made and that Jim Walter Homes, Inc., would undertake to rectify it. Even at the trial an official of appellee who was in charge of its records and documents testified that a mistake had been made. The employee of appellee, John Lindsay, who inked out the questioned second forty-foot strip on the survey was not called as a witness. His absence was accounted for only by a vague statement from another employee that Lindsay was no longer employed by appellee and that the witness had been unable to locate Lindsay after some effort, the details of which he did not describe. The record stands undisputed, therefore, that Lindsay, a duly authorized agent of appellee, represented to appellants that the second right-of-way should not have been included in the deed of trust, that a mistake had been made, and that appellee would undertake to rectify it through its own attorneys, agents and employees.

All of this occurred well before execution of the deed by appellants to their son Glenn. In our opinion appellants were entitled to rely upon the representations and promises of appellee, which is a large multistate corporation dealing with the surveying and conveyancing of vast amounts of real estate, as well as residential construction. The contractual relationship between the parties was not limited to the construction of a residence for appellants and Howard Lusk. Appellee furnished its personnel to plat the property and to draft the necessary legal documents. They made an error, and other representatives of appellee agreed to correct this by releasing the encroaching right-of-way. The power to do this lay solely with appellee and its employees, since it held a deed of trust upon this second right-of-way. All that was required was for it to execute a partial release of the property embraced within its deed of trust, and to obtain an instrument from the Lusks making the first right-of-way a joint one.

There is evidence from appellant Carl Lusk that he never intended to convey to his son Howard Lusk a forty-foot right-of-way in fee simple, but only intended to convey an easement. The conveyancing was drafted, however, by representatives of appellee and not by Mr. Lusk. Lusk is legally responsible for what the deed contained, and this is not a suit for reformation thereof. Nevertheless there was evidence from which the jury could have concluded that the intention of all concerned was that there be only a single right-of-way running from Cat Creek Road back to the properties upon which Carl Lusk and his son Howard had built, and that there was never any

intention whatever that a second right-of-way, immediately adjacent to the first, would be created, so as to encroach upon the residential site of Glenn Lusk.

As previously stated, all of these matters were controverted and, in our opinion, represented classic issues for the jury. The jury having resolved them in favor of appellants, including the credibility of appellants and their witnesses, in our opinion there was material evidence upon which the jury could conclude that a serious mistake had been made by representatives of appellee, that these representatives had later recognized the mistake and that they agreed to rectify it.

The mistake was first discovered early in February 1978. Yet no correction whatever seems to have been attempted for over a year. Not until after the property of Glenn Lusk had been foreclosed in April 1979 was any sort of quitclaim instrument executed by appellee, and this appears to have been inaccurate and insufficient to correct the problem. While explanations for this delay were offered by appellee and its witnesses, the weight and credibility of their testimony were for the jury to determine. It is undisputed in the record that Mr. Lindsay first marked out the second right-of-way in ink and stated that it was a mistake in February 1978, before appellants executed the deed to Glenn Lusk and warranted that conveyance against encumbrances or encroachments.

In our opinion the evidence supports a finding of an implied obligation to indemnify arising out of the relationship of the parties and out of the agreement of appellee to rectify the mistakes which its surveyor and draftsmen had made. The case is controlled by the principles stated in *Houseboating Corporation of America v. Marshall,* 553 S.W.2d 588, 589 (Tenn.1977), as follows:

> "Principles of indemnification are well settled in Tennessee law. In the case of *Southern Coal & Coke Co. v. Beech Grove Mining Co.,* 53 Tenn.App. 108, 381 S.W.2d 299 (1963), a selling corporation was al-

lowed indemnification against a producing corporation where the former had guaranteed and discharged obligations of the latter under certain federal statutes. In that case the Court said:

> " 'The right to indemnity rests upon the principle that everyone is responsible for the consequences of his own wrong, and if another person has been compelled to pay the damages which .the wrongdoer should have paid, the latter becomes liable to the former.' 53 Tenn.App. at 116, 381 S.W.2d at 302.

> "[1] Contracts of indemnification may be express, or an obligation to indemnify may arise by implication from the relationship of the parties, as in the *Southern Coal & Coke case, supra.* See *Ryan Stevedoring Co. v. Pan Atl. S.S. Co.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); see also *Mason-Dixon Lines v. General Electric Corp.,* 270 F.2d 780 (4th Cir.1959), cert. denied, 361 U.S. 964, 80 S.Ct. 593, 4 L.Ed.2d 545 (1960), a case tried in Virginia but involving some aspects of Tennessee law."

In the *Ryan Stevedoring* case, *supra,* the stevedoring contractor had contracted to unload a vessel. Its employees negligently did so in a manner to render the owner of the vessel liable for personal injuries. Out of the contract to unload the vessel, an agreement to indemnify the owner against such losses was found to be implied despite the absence of an express hold-harmless provision. The same was true in the *Mason-Dixon* case, *supra,* the agreement being implied from the contract of carriage.

■ Here appellee undertook to provide skilled personnel to plat land, to provide accurate legal descriptions and to draft conveyances. There was a direct contractual relationship between these parties. Implicit within this, in our opinion, was an obligation of appellee to indemnify appellants against errors negligently made in the preparation of these conveyances, especially after an error was discovered and an express agreement made to correct it.

The Court of Appeals, in denying indemnification, cited testimony of appellant Carl Lusk that at any time he had sufficient resources to repay his loan from appellee, which was secured by the deed of trust containing the offending encroachment. Appellee would then have released the instrument and the second right-of-way would have been extinguished. The Court of Appeals invoked the familiar principle of a duty to mitigate damages by one injured through breach of contract.

The deed of trust, however, secured a long-term debt of over thirty-seven thousand dollars. Appellants were not in default as to any of the provisions of the deed of trust. Indeed, it had just been recorded and the survey freshly made when appellants discovered the mistake of appellee early in February 1978. They promptly received assurances that the mistake would be corrected so that when they shortly thereafter deeded a .54 acre tract to Glenn, they had no reason to expect that appellee would delay for over a year in preparing a corrective release. Appellants and their sons were lay persons, unskilled in land conveyancing. Appellee is expert in the field. At no time did appellee ever state to appellants that it would not correct the encroachment as its employees had promised.

Under these circumstances we do not believe that appellants were required to pay prematurely the full indebtedness secured by their deed of trust in order to relieve appellee of the consequences of its mistake.[2] The jury was fully charged on the rules of causation and were told not to allow any damages in the principal suit or in the third-party action except those caused by breach of obligation of any defending party.

The judgments of the courts below granting judgment notwithstanding the verdict are reversed. The judgment of the trial court entered upon the jury verdict is reinstated and the cause is remanded to the trial court for any further orders or process which may be necessary. All costs are taxed to appellee.

FONES, C.J., and COOPER, BROCK and DROWOTA, JJ., concur.

---

2. For reasons not explained in the record, both Carl Lusk and his son Howard later defaulted on their loans from appellee. Both of their properties were foreclosed. The purchasers of Howard's tract, when contacted by Glenn and his wife about the right-of-way problem, were told by appellee that it would handle the situation through its employees. After Glenn Lusk experienced his problem in obtaining permanent financing and was threatened with foreclosure, appellees assured Glenn's construction lender, First National Bank, that it would execute a quitclaim to the encroaching area. It did not do so until June, 1979, after Glenn's property was sold at foreclosure, despite the fact that its representatives had ordered a title check and a new survey by April at the latest—more than fourteen months after Lindsay had acknowledged the error. The corrective instrument was prepared by the Bank, not by appellee, and at trial it was demonstrated to contain errors which probably left the situation uncorrected.

APPENDIX

1.2 ACRES CONVEYED
TO HOWARD LUSK by
CARL AND Helen LUSK
by DEED EXECUTED AND FILED
FOR RECORD ON 29 NOVEMBER 1977

PROPERTY COVERED by DEED OF TRUST
EXECUTED by CARL AND Helen
LUSK TO SECURE NOTE TO
JIM WAITEN OF RECORD JAN 9, 1978

40' STRIP

Second 40' STRIP

PROPERTY CONVEYED
TO GLENN AND
CAROLYN LUSK by
CARL AND Helen by
DEED EXECUTED
AND RECORDED Feb
27, 1978

CAT CREEK ROAD

ADDENDUM