Helene WINTER, Plaintiff–Appellant,

v.

Tommy SMITH, Defendant–Appellee.

**GARY FARMER TRUCKING,**
**Plaintiff–Appellee,**

v.

Helene WINTER, Defendant–Appellant
and Tommy Smith, Defendant–
Appellee.

Court of Appeals of Tennessee,
Middle Section.

Aug. 23, 1995.

Permission to Appeal denied by
Supreme Court Dec. 18, 1995.

Larry R. Williams and René Riggs Gilliam, Williams, Smith & Dozier, Nashville, for Helene Winter.

Robert L. Jones and G. Brian Jackson, Trabue, Sturdivant & DeWitt, Nashville, for Gary Farmer Trucking.

Robert A. Anderson, Nashville, for Tommy Smith.

## OPINION

KOCH, Judge.

This appeal concerns two consolidated lawsuits arising from the construction of an equestrian center in Williamson County. The first suit involves the landowner and a contractor who was terminated before the project's completion. The second suit involves the landowner, the terminated contractor, and two of the contractor's unpaid suppliers. After receiving a jury's answers to special interrogatories, the Chancery Court for Williamson County found that the contractor was contractually indebted to his unpaid suppliers, that the suppliers were entitled to liens on the project, and that the landowner must indemnify the contractor for

his payments to the suppliers. Both the landowner and the contractor have appealed. The landowner raises issues on this appeal concerning the existence and scope of the parties' respective indemnification rights and the lien rights of one of the suppliers; while the contractor takes issue with the dismissal of his damage claims against the landowner. We affirm the judgment except for the trial court's conclusions with regard to the contractor's indemnification rights.

## I.

Helene Winter decided to build an equestrian center in Williamson County after her teenage daughter became interested in show jumping. She arranged to purchase fifty-five acres of undeveloped property on Old Hillsboro Road. She intended to construct the center herself and then to lease it to a family corporation called Schandwin Farm, Inc.[1] Her plans called for the construction of a stable with an indoor ring, three outdoor show rings, paddocks, a manager's residence, and other related improvements including fences and an access road.

Ms. Winter decided to oversee and coordinate the improvements on the property herself even though she had little experience with construction. She retained one contractor to build the barn and another to erect all the fences on the property. Since the project called for extensive site preparation, she retained a third contractor to perform all the excavation, grading, and road construction. These lawsuits relate to the excavation and grading contract.

Ms. Winter contacted Tommy Smith in late October 1989 about doing the grading and excavation work for the project. Mr. Smith had been a foreman for a large construction company and was then operating his own business called Smith Dozier [sic] Service. He had been licensed as a contractor until 1987 but was not licensed when Ms. Winter contacted him. Ms. Winter and Mr. Smith met at the job site to discuss the project, and while the precise terms of their agreement are not clear, Mr. Smith agreed to do excavation work for Ms. Winter and to charge her $50.00 per hour for the use of his bulldozer.[2]

Ms. Winter's surveyor placed the grading stakes on the property, and Mr. Smith began work on November 2, 1989. After wet weather interrupted the work for several days, Ms. Winter telephoned Mr. Smith on November 16, 1989 to find out why he was not working. Despite Mr. Smith's explanation that wet soil conditions hampered the grading and excavating, Ms. Winter insisted that Mr. Smith continue working despite the weather because she was planning to have horse shows in the spring and wanted the barn built as soon as possible.

Ms. Winter customarily made daily visits to the job site when she was in town, and she and Mr. Smith met at the job site on November 17, 1989. She paid Mr. Smith $2,000 and asked him for an estimate of the cost to complete the project. Ms. Winter assumed that the estimate would include all the work for the project; while Mr. Smith assumed that Ms. Winter wanted an estimate for the cost of completing only the barn pad, the parking lot at the barn, and the road from Old Hillsboro Road to the barn.

On November 22, 1989, Mr. Smith gave Ms. Winter an estimate that the lump sum cost to complete the work would be $91,726. Ms. Winter decided against accepting the lump sum quote and to continue paying Mr. Smith in accordance with their original agreement after her surveyor commented that the estimate seemed high and after Mr.

1. Schandwin Farm, Inc. was incorporated in November 1989. Ms. Winter was the sole incorporator and serves as the corporation's president. Her daughter owns all the corporation's stock.

2. Like most disputes involving oral construction contracts, the parties disagreed about the scope of the work and the terms of compensation. Ms. Winter insists that she hired Mr. Smith from the outset to perform all the grading and excavation work for the project. Mr. Smith, on the other hand, insists that Ms. Winter increased the scope of the job as the work progressed and that their initial agreement covered only digging the barn pad, building the road from Old Hillsboro Road to the barn, and constructing the parking lot at the barn. Ms. Winter also insists that Mr. Smith agreed not to charge her more than his actual cost for the equipment and materials used at the project. For his part, Mr. Smith insists that their "time and materials" agreement permitted him to make a profit on these items.

Smith told her that she would end up spending less if he worked on a "time and materials" basis. During this meeting, Ms. Winter instructed Mr. Smith to continue building the road from the barn to the back of the property and discussed building the three show rings.

On November 30, 1989, Mr. Smith gave Ms. Winter a statement for $12,522.50 for the work from November 2 through November 30, 1989. The statement included charges for a bulldozer, a loader, a scraper, a truck, and a roller. Mr. Smith had obtained several of these pieces of equipment from Dixie Earthmovers, Inc. While he and Ms. Winter had agreed on the hourly charges for the equipment, Ms. Winter was not aware that the charge for the equipment obtained from Dixie Earthmovers included Mr. Smith's markup. Ms. Winter paid Mr. Smith $12,522.50 on December 1, 1989.

The project called for a large amount of crushed stone and gravel for the road, the parking lot, the barn pad, and the show rings. The parties' original agreement required Ms. Winter to furnish these materials. When the work progressed to the point where the stone was required, Ms. Winter arranged with Bentley and Son Trucking & Construction ("Bentley") to begin delivering stone to the job site. Bentley, however, would only do business with Ms. Winter on a COD basis, and thus she was required to be at the job site every day to write a check for the stone that had been delivered.

Mr. Smith paid Bentley for stone on one occasion because Ms. Winter could not come to the job site. On December 12, 1989, Ms. Winter complained to Mr. Smith about Bentley's prices, and Mr. Smith informed her that Buford Trucking ("Buford") could furnish the same material for $6.00 per ton. Since Ms. Winter had been paying Bentley $6.55 per ton for stone, she decided to begin purchasing the stone from Buford.

Buford, however, would not agree to extend credit to Ms. Winter and insisted on billing Mr. Smith directly for the stone. In order to avoid the inconvenience of paying for the stone on a daily basis, Ms. Winter and Mr. Smith eventually agreed that Mr. Smith would purchase the stone. Ms. Winter agreed to pay $6.00 per ton for the stone, and Mr. Smith agreed to include the charges for the stone in his periodic statements. Ms. Winter assumed that Mr. Smith had agreed to charge her no more than his actual cost for the stone; while Mr. Smith understood that Ms. Winter had agreed to pay $6.00 per ton for stone, regardless of his actual cost.

On December 13, 1989, Mr. Smith gave Ms. Winter another statement for $10,973 covering the work from December 1 through December 12, 1989. On the same day, Ms. Winter gave Mr. Smith a check for $11,153.50 in payment for the work covered by the statement and to reimburse Mr. Smith for the stone he had purchased from Bentley on December 6, 1989, when she was unable to be on-site to write the check.

The grading work continued to be delayed by bad weather. Ms. Winter was not pleased with the progress, and on January 10, 1990, she told Mr. Smith that she intended to contact Buford to arrange for more earth moving equipment. Mr. Smith explained that using more equipment would increase Ms. Winter's already high equipment costs, but Ms. Winter was more concerned with early completion of the project than with the costs. When Ms. Winter continued to insist on using more equipment, Mr. Smith obtained several additional pieces of equipment from Dixie Earthmovers. Ms. Winter assumed that she was reimbursing Mr. Smith for his actual costs for the equipment and did not realize that the hourly rate she agreed to pay included Mr. Smith's markup.

Mr. Smith provided Ms. Winter with another statement for $21,920.37 on January 22, 1990, covering the work from December 13, 1989, through January 17, 1990. This statement reflected the use of three additional pieces of equipment. It also included a $2,066.91 charge for gravel, supported by a copy of Buford's bill to Mr. Smith for $2,066.91 and, for the first time, a $78.00 charge identified as "foreman." When Ms. Winter questioned Mr. Smith about this charge, he explained that it was for the time he spent on the project when he was not actually running a piece of equipment. Ms. Winter was satisfied with this explanation

and agreed to pay Mr. Smith $12.00 per hour for this work. She also wrote Mr. Smith a check for $22,000.

Mr. Smith discovered in early January 1990 that he could purchase stone from Anchor Rock Products ("Anchor Rock") for less than what he was paying Buford. He began ordering from Anchor Rock in mid-January and eventually purchased approximately 7,900 tons of stone for between $5.00 and $5.85 per ton.[3] He continued to charge Ms. Winter $6.00 per ton but did not inform her that he was now paying less for the material. He did, however, provide her with Anchor Rock's scale tickets showing the amount of material being delivered to the project. These tickets did not, however, indicate how much Mr. Smith had paid for the stone.

Mr. Smith gave Ms. Winter a statement for $32,487.03 on February 23, 1990, covering work from December 27, 1989, through February 22, 1990. In addition to the charges for the equipment, the stone, and Mr. Smith's "foreman" time, the statement also contained charges for 214 loads of fill material. Ms. Winter paid Mr. Smith $32,487.03 on February 23, 1990, even though she did not recall discussing the need for fill material with him.

On March 26, 1990, Mr. Smith gave Ms. Winter another statement for $51,507.03 for the work performed between February 23 and March 24, 1990. Included in this bill was a $20,421.43 charge for gravel. Mr. Smith told Ms. Winter that he had purchased a lot of stone and gravel but that the job was almost finished. Ms. Winter continued to be pleased with the quality of the work and on March 27, 1990 wrote Mr. Smith another check for $51,507.03.

Some time in mid-April, Ms. Winter asked Mr. Smith to estimate the costs to complete the project. On April 30, 1990, Mr. Smith gave Ms. Winter an estimate sheet showing that the cost to complete the project would be approximately $65,360. He also gave her a statement for $58,595.25 covering the work performed between March 26 and April 24, 1990, including a $36,223 charge for stone and gravel. Ms. Winter gave Mr. Smith a check for $40,000 and told him that she needed to transfer additional funds into the account before paying the balance.

Ms. Winter, in fact, had sufficient funds in her account but was now concerned about the cost of the project. She had already paid Mr. Smith $131,670 and it appeared to her that she would eventually pay Mr. Smith approximately two and one-half times the amount of his original estimate.[4] After she left the job site, she telephoned Anchor Rock and Dixie Earthmovers and discovered that Mr. Smith had been charging her more than his actual costs for the equipment and the stone. She stopped payment on the $40,000 check, and on the evening of April 30, 1990, her attorney telephoned Mr. Smith to inform him that he was terminated because he had been overcharging Ms. Winter.

Mr. Smith removed his equipment from the job site on May 2, 1990, and eventually sent Ms. Winter a revised final bill for $63,553.46. Anchor Rock sent Ms. Winter and Mr. Smith a statement for $16,455.97 for the stone that had not been paid for, and Gary Farmer Trucking likewise submitted a $15,288.46 bill for its unpaid transportation charges. Dixie Earthmovers also demanded payment of the balance due on its equipment. When these bills went unpaid, Mr. Smith filed a $62,180.96 lien on Ms. Winter's property. Several weeks later, Dixie Earthmovers filed a $5,801.25 lien on the property for its unpaid equipment charges. Anchor Rock and Gary Farmer Trucking also filed liens on Ms. Winter's property for $16,455.97 and $15,288.46 respectively.

---

3. This price included the cost of the stone and gravel and the cost of transporting the material to the job site. Anchor Rock submitted bills for the stone and gravel, while Gary Farmer Trucking Company submitted separate bills for delivering the material.

4. Based on her understanding that Mr. Smith's original November 1989 estimate included all the grading and excavation work on the project, Ms. Winter believed that Mr. Smith's portion of the work would cost approximately $91,000. Taking Mr. Smith's April 30, 1990 statement and his estimate of the costs to complete the work into consideration, Ms. Winter's projected total payments to Mr. Smith would have exceeded $250,000.

Ms. Winter sued Mr. Smith in the Chancery Court for Williamson County on May 25, 1990, alleging that he had overcharged her for the stone and equipment used on the job and that she was entitled to compensatory and punitive damages. Mr. Smith counterclaimed for the unpaid balance of his final bill. Shortly thereafter, Dixie Earthmovers filed suit against Ms. Winter and Mr. Smith for its unpaid equipment charges,[5] and Anchor Rock and Gary Farmer Trucking filed another suit against Ms. Winter and Mr. Smith for their unpaid stone and transportation charges. Ms. Winter responded to Anchor Rock's claim by asserting that all the stone for which it was demanding payment had not been delivered to the job. The trial court later consolidated these three proceedings.

In February 1992 the trial court granted a partial summary judgment limiting Mr. Smith's recovery against Ms. Winter to his actual documented expenses because he did not possess the required contractor's license. The trial commenced on August 18, 1993. Before submitting special interrogatories to the jury, the trial court directed a verdict for Ms. Winter on Mr. Smith's counterclaim because she had paid him more than the actual documented expenses he had proved at trial. The jury found that Mr. Smith negligently concealed material facts from Ms. Winter relating to the performance of the work but also that Ms. Winter was not entitled to monetary damages as a result of these negligent misrepresentations. The jury also found that all the stone listed on Anchor Rock's scale tickets had been delivered to Ms. Winter's property and, therefore, that Anchor Rock and Gary Farmer Trucking were entitled to $16,455.97 and $15,288.46 respectively.

Based on the jury's answers to the special interrogatories, the trial court determined that Mr. Smith had breached his contracts with Anchor Rock and Gary Farmer Trucking and that they were entitled to judgments of $16,455.97 and $15,288.46 respectively and prejudgment interest. The trial court denied

Anchor Rock's and Gary Farmer Trucking's claims against Ms. Winter but granted them liens against her property. It also determined that Ms. Winter must indemnify Mr. Smith for his payments to Anchor Rock and Gary Farmer Trucking and for a portion of his legal expenses.

## II.

### APPLICATION OF THE CONTRACTORS LICENSING STATUTES TO MR. SMITH

■ We turn first to the preliminary summary adjudication limiting Mr. Smith's counterclaim because he did not have a contractor's license during his work on the Schandwin Farm project. Mr. Smith asserts that the trial court should have permitted the jury to decide whether he was required to have a contractor's license. We disagree because the interpretation of statutes is a judicial function and because there are no material disputes with regard to the facts relevant to the application of the contractors licensing statutes to the circumstances of this case.

### A.

Mr. Smith filed a counterclaim against Ms. Winter seeking to recover the unpaid balance of his final statement. Ms. Winter's answer to the counterclaim included an affirmative defense based on Tenn.Code Ann. § 62–6–103(c) that Mr. Smith could recover no more than his actual documented expenses because he was an unlicensed contractor when he did the work. She also raised this defense in a motion for partial summary judgment. For his part, Mr. Smith asserted that he was not required to obtain a contractor's license because he was a subcontractor performing work for which a license was not required.

The trial court heard the motion in February 1992. Based on the parties' affidavits and excerpts from their depositions, the trial court found that Mr. Smith was engaged in contracting for the purposes of the contractors licensing statutes and that his damages would be limited to his actual documented

---

**5.** Dixie Earthmovers eventually settled with Ms. Winter and assigned its remaining claim against

Mr. Smith to her.

expenses because he did not have the required license. The trial court specifically reserved ruling on "all other causes of action, defenses and affirmative defenses."

After the trial began in August 1993, Mr. Smith asked the trial court[6] to reconsider the earlier decision limiting his damages. On this occasion, he provided the trial court with copies of Schandwin Farm's corporate documents and various building permits that Ms. Winter had obtained for the project. These documents substantiated the factual allegations contained in an affidavit Mr. Smith had filed in January 1992 in opposition to Ms. Winter's motion for summary judgment. The trial court adhered to the original decision limiting Mr. Smith's damages.

## B.

■ The appealability of orders granting summary judgments is straightforward when the summary judgment resolves all the claims between all the parties. These types of summary judgments are final orders and are appealable as of right in accordance with Tenn.R.App.P. 3(a). The appealability of orders granting summary judgments can become more complicated in multiple-party or multiple-claim litigation when the summary judgment does not have the effect of terminating the entire lawsuit. 10 Charles A. Wright et al., *Federal Practice and Procedure* § 2715, at 626 (2d ed. 1983).

■ Parties may use a motion for summary judgment to dispose of all or any part of their claims or defenses. Tenn.R.Civ.P. 56.01, 56.02. A motion that does not dispose of the entire lawsuit is normally not appealable as of right, unless the trial court certifies that its order is final in accordance with Tenn.R.Civ.P. 54.02. *See Aaro, Inc. v. Daewoo Int'l (Am.) Corp.,* 755 F.2d 1398, 1400 (11th Cir.1985); *Gould v. Control Laser Corp.,* 650 F.2d 617, 619–20 (5th Cir. Unit B July 1981). Without a Tenn.R.Civ.P. 54.02 certification of finality, an order adjudicating only part of the claims or defenses remains interlocutory and is subject to revision by the trial court any time prior to the entry of a final judgment adjudicating all the claims raised. *Guess v. Maury,* 726 S.W.2d 906, 922 (Tenn.Ct.App.1986); *see also Anixter v. Home–Stake Prod. Co.,* 977 F.2d 1533, 1548 (10th Cir.1992), *cert. denied,* 507 U.S. 1029, 113 S.Ct. 1841–42, 123 L.Ed.2d 467 (1993); *Bodine v. Federal Kemper Life Assurance Co.,* 912 F.2d 1373, 1376 (11th Cir.1990), *cert. denied,* 499 U.S. 905, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991); 6 James W. Moore, *Moore's Federal Practice* ¶ 56.20[3.–3], at 56–701 (2d ed. 1995).

■ Following the entry of a final order, any party affected by the interlocutory summary adjudication may challenge the adjudication on appeal. Like other decisions granting Tenn.R.Civ.P. 56 motions, we review these decisions de novo using the same criteria employed by the trial court. *Bradshaw v. Daniel,* 854 S.W.2d 865, 870 (Tenn.1993); *Brenner v. Textron Aerostructures,* 874 S.W.2d 579, 582 (Tenn.Ct.App.1993). We need only determine whether the requirements of Tenn.R.Civ.P. 56 have been met. *Payne v. Breuer,* 891 S.W.2d 200, 201 (Tenn. 1994); *Cowden v. Sovran Bank/Central S.,* 816 S.W.2d 741, 744 (Tenn.1991). Accordingly, we will uphold an interlocutory summary adjudication if there are no material factual disputes involving the relevant facts and if the moving party is entitled to a judgment as a matter of law.

■ Our review of the facts is limited to the record before the trial court when it heard the motion. *See Johnson v. Oman Constr. Co.,* 519 S.W.2d 782, 789 (Tenn.1975); *Franklin Distrib. Co. v. Crush Int'l (U.S.A.), Inc.,* 726 S.W.2d 926, 929 (Tenn.Ct.App.1986); Tenn.Ct.App.R. 4(a). We need not confine ourselves to the record as it stood in February 1992 when the trial court first acted on the motion because this action was interlocutory. Because the trial court reconsidered the February 1992 order in August 1993, we should consider the record as it stood in August 1993 to determine whether it contained material factual disputes concerning

---

**6.** The judge who presided over the trial in August 1993 was not the same judge who granted Ms.

Winter's motion in February 1992.

the application of Tenn.Code Ann. § 62–6–103(c) to Mr. Smith's claim.

### C.

The penalty for unlicensed contracting in Tenn.Code Ann. § 62–6–103(c) seems simple on the surface. The statute provides that "[a]ny unlicensed contractor covered by the provisions of this chapter shall be permitted in a court of equity to recover actual documented expenses only upon a showing of clear and convincing proof." The problems with the application of this penalty stem from the difficulty in determining whether a particular contractor is required to be licensed.

### EVOLUTION OF THE LICENSING STATUTES

The General Assembly has changed the scope of the contractors licensing statutes seventeen times since the first statutes were enacted in 1931. The original statutes covered "general contractors" working on projects exceeding $10,000 and specifically excluded "sub-contractors or persons, firms or corporations not in privity with the owner of the property being improved" from the licensing requirement.[7] The statutes enacted fourteen years later expanded the licensing requirement to persons contracting directly with the owner for "any part of the construction" when the entire cost of the project exceeded $10,000. Like the earlier statutes, these statutes did not apply to subcontractors and persons not in privity with the owner.[8]

The General Assembly rewrote the licensing statutes again in 1976. These new statutes required any person "engaged in contracting" to obtain a license.[9] The definition of "contracting" differed from the earlier definition of "general contractor" in several material respects. First, it increased the licensing threshold to projects exceeding $20,000. Second, it expanded the scope of contracting to include subcontractors doing electrical, plumbing, heating, or ventilating and air conditioning work if the sum of the subcontracts for these four classifications equalled or exceeded $20,000.[10] Like the 1945 statute, the 1976 statute's definition of "contractor" applied to persons contracting directly with the owner when the cost of their portion of the work exceeded $20,000. It stated that these persons "shall be treated as a prime contractor."[11]

The General Assembly amended the definition of "contractor" twice in 1977. The amendments in the first act[12] were incorporated into the amendments in the second act. The second act increased the licensing threshold to $50,000 but otherwise left the definition of "contracting" unchanged. Thus, subcontractors "engage[d] in the electrical, plumbing, heating or ventilating and air conditioning [HVAC] classifications of contracting" and "any person ... contracting with the original owner" were required to be licensed if the cost of their work exceeded $50,000.[13]

The definitions of "contractor" and "contracting" were rewritten again in 1980. The term "contractor" was defined to include any person "who engages or offers to engage in contracting."[14] The definition of "contracting" remained unchanged in scope except as it related to certain types of home construction. The new definition included all types of improvements to real property when the cost of the completed work equalled or exceeded

---

**7.** Act of July 1, 1931, ch. 70, § 11, 1931 Tenn. Pub.Acts 180, 187 (codified at 4 Williams Code of Tennessee § 7182.35 (1934)).

**8.** Act of Feb. 28, 1945, ch. 135, § 11, 1945 Tenn. Pub.Acts 416, 424 (codified at 4 Williams Code of Tennessee § 7182.35 (Supp.1952)).

**9.** Act of Mar. 18, 1976, ch. 822, § 3, 1976 Tenn. Pub.Acts 1216, 1218 (codified at Tenn.Code Ann. § 62–603 (Supp.1976)).

**10.** Act of Mar. 18, 1976, ch. 822, § 2, 1976 Tenn.Pub.Acts 1216, 1217 (codified at Tenn.Code Ann. § 62–602 (Supp.1976)).

**11.** Act of Mar. 18, 1976, ch. 822, § 2, 1976 Tenn.Pub.Acts 1216, 1217–18 (codified at Tenn. Code Ann. § 62–602 (Supp.1976)).

**12.** Act of Apr. 13, 1977, ch. 101, 1977 Tenn.Pub. Acts 203.

**13.** Act of May 19, 1977, ch. 406, § 1, 1977 Tenn. Pub.Acts 1020, 1020–21.

**14.** Act of Mar. 17, 1980, ch. 652, § 3, 1980 Tenn.Pub.Acts 525, 528.

$50,000. It specifically excluded "subcontracting" except for electrical, plumbing, and HVAC subcontracts for work costing $50,000 or more.[15] The 1980 legislation did not define "subcontracting" and did not include specific references to persons contracting with or in privity with the owner of the property.

The five amendments to the definition of "contracting" occurring between 1981 and 1989 are not relevant to this case.[16] Thus, at the time Mr. Smith contracted with Ms. Winter to perform work at Schandwin Farm, the relevant portions of Tenn.Code Ann. § 62–6–102 defined "contracting" as follows:

(1)(A) "Contracting" means undertaking, for a fixed price, fee, commission, or gain of whatever nature, to construct, erect, alter, repair, supervise, superintend, oversee, direct, or in any manner assume charge of the construction, erection, alteration, or repair of part or all of any structure, or private work or utility of any nature or character whatsoever, including railroads, municipal works, water supply systems, sewerage and drainage systems, levies, locks and dams, canals, industrial works, or any highway, road, bridge, or similar structure or project, where the cost of the completed work, or of different projects under a single contract, equals or exceeds twenty-five thousand dollars ($25,000);

* * * * * *

(B) However, "contracting" shall not include:

(i) Subcontracting, unless a subcontract involves:

(a) Fifty thousand dollars ($50,000) or more of electrical work;

(b) Fifty thousand dollars ($50,000) or more of plumbing work; or

(c) Fifty thousand dollars ($50,000) or more of heating, ventilating or air conditioning work.

* * * * * *

The definition of "contracting" was amended five more times between 1991 and 1994.[17] These later amendments are not relevant to this appeal because Mr. Smith's and Ms. Winter's rights and obligations are governed by the law in existence when they entered into their agreement. *See Gene Taylor & Sons Plumbing Co. v. Corondolet Realty Trust*, 611 S.W.2d 572, 574 (Tenn.1981).

### CONSTRUCTION OF THE CONTRACTORS LICENSING STATUTES

The success of Ms. Winter's affirmative defense based on Tenn.Code Ann. § 62–6–103(c) depends on whether Mr. Smith was "contracting" or "subcontracting" on the Schandwin Farm project. If he was contracting, he would have been a "contractor covered by the provisions of this chapter" and, therefore, would be subject to sanction under Tenn.Code Ann. § 62–6–103(c). If, however, he was subcontracting, he would not have been required to be licensed, and Tenn.Code Ann. § 62–6–103(c) would not affect his counterclaim against Ms. Winter.

**15.** Act of Mar. 17, 1980, ch. 652, § 3, 1980 Tenn.Pub.Acts 525, 527.

**16.** Act of May 11, 1981, ch. 399, 1981 Tenn.Pub.Acts 578 (excluding state highway contracts from the definition of contracting); Act of Apr. 1, 1982, ch. 737, 1982 Tenn.Pub.Acts 329 (including construction managers); Act of Apr. 17, 1985, ch. 245, 1985 Tenn.Pub.Acts 442 (decreasing the licensing threshold from $50,000 to $25,000); Act of Mar. 14, 1988, ch. 589, 1988 Tenn.Pub.Acts 223 (requiring masonry subcontractors to be licensed); and Act of May 11, 1989, ch. 336, 1989 Tenn.Pub.Acts 548 (deleting the licensing requirement for masonry subcontractors).

**17.** Act of Apr. 8, 1991, ch. 173, 1991 Tenn.Pub.Acts 319 (decreasing the licensing threshold for the three classifications of covered subcontrac-
tors from $50,000 to $25,000); Act of Apr. 11, 1991, ch. 217, 1991 Tenn.Pub.Acts 385 (clarifying the licensing requirement for construction managers); Act of Apr. 30, 1992, ch. 1020, 1992 Tenn.Pub.Acts 1139 (redefining the exclusion for persons building residences on private property in their home counties); Act of Mar. 29, 1993, ch. 147, 1993 Tenn.Pub.Acts 224 (broadening the exclusion for persons building residences on private property in their home counties); and Act of Apr. 20, 1994, ch. 986, 1994 Tenn.Pub.Acts 997 (enacting the Contractors Licensing Act of 1994 containing new definitions of "contractor," "contracting," "residential contractor," "prime contractor," and "commercial building contractors").

Mr. Smith first argues that the trial court should have permitted the jury to determine "how many persons other than classic 'general contractors' were intended to be covered by the legislature." We disagree. Statutory construction is not a question of fact for the jury but rather a question of law for the courts. *Roseman v. Roseman,* 890 S.W.2d 27, 29 (Tenn.1994); *Penn–Dixie Cement Corp. v. Kizer,* 194 Tenn. 412, 426, 250 S.W.2d 904, 910, *appeal dismissed,* 344 U.S. 890, 73 S.Ct. 212, 97 L.Ed. 689 (1952). It is the courts who must ascertain and then give the fullest possible effect to a statute's purpose without unduly restricting or expanding the statute beyond its intended scope. *Wilson v. Johnson County,* 879 S.W.2d 807, 809 (Tenn.1994); *Lyons v. Rasar,* 872 S.W.2d 895, 897 (Tenn.1994).

The search for a statute's purpose begins with its language. *Neff v. Cherokee Ins. Co.,* 704 S.W.2d 1, 3 (Tenn.1986). The statute's words draw their meaning from the context of the whole statute, *Lyons v. Rasar,* 872 S.W.2d at 897; *Knox County ex rel. Kessel v. Lenoir City,* 837 S.W.2d 382, 387 (Tenn.1992), and from the statute's general purpose. *City of Lenoir City v. State ex rel. City of Loudon,* 571 S.W.2d 297, 299 (Tenn.1978); *Loftin v. Langsdon,* 813 S.W.2d 475, 478 (Tenn.Ct.App.1991). We give these words their natural and ordinary meaning, *State ex rel. Metro. Gov't v. Spicewood Creek Watershed Dist.,* 848 S.W.2d 60, 62 (Tenn. 1993); *AFG Indus., Inc. v. Cardwell,* 835 S.W.2d 583, 584 (Tenn.1992), unless the General Assembly intends to use them in a specialized, technical sense. *Cordis Corp. v. Taylor,* 762 S.W.2d 138, 139–40 (Tenn.1988).

The courts will not construe statutes to change existing law more than a statute itself declares or necessarily implies. *Harman v. Moore's Quality Snack Foods, Inc.,* 815 S.W.2d 519, 523 (Tenn.Ct.App.1991); *Plough, Inc. v. Premier Pneumatics, Inc.,* 660 S.W.2d 495, 498 (Tenn.Ct.App.1983).

Since the General Assembly is presumed to know the law, *Wilson v. Johnson County,* 879 S.W.2d at 810, the courts will consider both the pre-existing and the later statutes relating to the statute being construed. *State ex rel. Cope v. Davidson County,* 198 Tenn. 24, 36, 277 S.W.2d 396, 401 (1955) (prior statutes); *Hart v. Reynolds,* 48 Tenn. (1 Heisk.) 208, 217 (1870) (later statutes); *Lewis v. Burrow,* 23 Tenn.App. 145, 150, 127 S.W.2d 795, 798 (1939) (prior statutes).

### THE MEANING OF "CONTRACTING" AND "SUBCONTRACTING"

The General Assembly determined fifty years ago that persons engaged in the construction business should be licensed "in order to safeguard life, health and property, and to promote public welfare." [18] The Tennessee Code Commission originally grouped these statutes under the section heading "general contractors" and has not changed the section heading despite the later changes in the statutes' scope. The section heading has no effect on the statutes' scope or application because it is not part of the law. Tenn.Code Ann. § 1–3–109 (1985). Accordingly, the statutes' licensing requirements broadly apply to all persons engaged in "contracting" as that term is defined in Tenn.Code Ann. § 62–6–102(1)(A).

The licensing statutes in existence when Mr. Smith performed the work at Schandwin Farm excluded only four types of construction activities from the broad definition of "contracting." These activities included: (1) subcontracting, unless the subcontract involved $50,000 or more of electrical, plumbing, or HVAC work; [19] (2) constructing dwellings on private property under certain circumstances; [20] (3) contracting with the Department of Transportation; [21] and (4) constructing single family residences, farm buildings, or other buildings for individual use and not for resale on the person's own property.[22] In response to Ms. Winter's affirmative defense that he was contracting

---

**18.** Act of Feb. 28, 1945, ch. 135, § 1, 1945 Tenn. Pub.Acts 416, 417 (codified at 4 Williams Code of Tennessee § 7182.25 (Supp.1952)).

**19.** Tenn.Code Ann. § 62–6–102(1)(B)(i)(a)–(c).

**20.** Tenn.Code Ann. § 62–6–102(1)(B)(ii).

**21.** Tenn.Code Ann. § 62–6–102(1)(B)(iii).

**22.** Tenn.Code Ann. § 62–6–103(a)(2)(A).

without a license, Mr. Smith asserted that he was not required to obtain a license because he was subcontracting on the Schandwin Farm project. Accordingly, we must determine the meaning of the word "subcontracting" as it appears in Tenn.Code Ann. § 62–6–102(1)(B)(i).

■■■ The common meaning of "subcontractor" coincides with the word's meaning in the construction context. A subcontractor is generally understood to be one who contracts to perform all or part of the work that another has already contracted to perform. *See* 17 *The Oxford English Dictionary* 18 (2d ed. 1989) (A subcontract is "[a] contract, or one of several contracts, for carrying out a previous contract or part of it."); *Webster's Third New Int'l Dictionary* 2274 (1971) (A subcontractor is "an individual or business firm that contracts to perform part or all of another's contract."). In the construction context, a subcontractor is a person who has a contract with the general or prime contractor to perform a portion of the work that the general or prime contractor has already contracted with the owner to perform. *Royal Indem. Co. v. Kenny Constr. Co.*, 528 F.2d 184, 190 (7th Cir.1975), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 (1976); *ABC Plumbing & Heating, Inc. v. Dick Corp.*, 684 S.W.2d 84, 87 (Tenn.1985); American Inst. of Architects, Doc. A201, *General Conditions of the Contract for Construction* § 5.1.1, at 37, *in* 3 The Architects' Handbook of Professional Practice (11th ed. 1988).

■■■ The traditional construction relationship involves a direct contractual relationship between the owner and the general contractor who is also referred to as the prime contractor, the principal contractor, or occasionally simply as the contractor. The general contractor performs the work with his own forces, through subcontractors, or with a combination of the two. Subcontractors have contracts with the general contractor, not the owner, and the general contractor is responsible for scheduling, coordinating, and supervising the subcontractors' work. 1 Construction L. (MB) ¶ 3.01[1][b][iii] (Steven G.M. Stein ed. 1992) ("Stein"). An entity contracting directly with the owner is not a subcontractor. *See Hackmann v. Sommerfor Dev. Corp.*, 741 S.W.2d 857, 859 (Mo.Ct.App. 1987).[23]

Defining a subcontractor as one who does not contract directly with the owner is consistent with the evolution of the contractors licensing statutes from 1931 through 1994. The 1931, 1945, 1976, and 1977 versions of the statutes stated that persons who contracted with or who were in privity with the owner were not subcontractors and would be required to be licensed. Tenn.Code Ann. § 62–6–102(3)(A) (Supp.1994) currently includes "prime contractors" in the definition of "contractor," and Tenn.Code Ann. § 62–6–102(4) defines a prime contractor as "one who contracts directly with the owner."

### Mr. Smith Was Not a Subcontractor on the Schandwin Farm Project

■■■ The record contains no genuine disputes concerning the facts relevant to determining whether Mr. Smith was contracting or subcontracting on the Schandwin Farm project. Ms. Winter owned the property where all the work was performed. Instead of hiring a general contractor to construct all the improvements, she decided to hire several contractors and to coordinate and supervise their work herself. Mr. Smith was one of the contractors Ms. Winter hired.

Mr. Smith does not deny that he contracted directly with Ms. Winter. Instead, he asserts that Ms. Winter was herself a contractor and, therefore, that he was a subcontractor who contracted to perform a portion of the work Ms. Winter had contracted to perform for Schandwin Farm, Inc. While many of the responsibilities that Ms. Winter took on during the construction would normally be a general contractor's responsibili-

---

**23.** An owner may contract directly for a specialty item or for part of the work before hiring a general contractor. When an owner does not have the desire or ability to supervise this work, it assigns these subcontractors to the general contractor who, for an additional fee, then steps into the owner's shoes. Stein, *supra*, ¶ 3.01[1][c][iv]. Even though these assigned subcontractors originally contracted with the owner, their contract is with the general contractor following the assignment.

ties,[24] the mere fact that she assumed these responsibilities does not transform the owner into a "contractor."

A contractor is defined in Tenn.Code Ann. § 62–6–102(2) as one who engages in "contracting," and contracting, according to Tenn. Code Ann. § 62–6–102(1)(A), includes only those construction activities undertaken "for a fixed price, fee, commission, or gain of whatever nature." The record indicates that Ms. Winter planned to construct the improvements and to lease them to Schandwin Farm, Inc. It does not indicate, however, that Ms. Winter leased the property to Schandwin Farm, Inc. before she contracted with Mr. Smith or, more importantly, that Ms. Winter had a contract with or received any consideration from Schandwin Farm. Thus, the only conclusion to be drawn from the evidence is that Ms. Winter was the owner of the Schandwin Farm project, not a contractor.

■ Mr. Smith was not a subcontractor on the Schandwin Farm project because he contracted directly with the owner. The nature of the work he performed falls within the definition of "contracting" in Tenn.Code Ann. § 62–6–102(1)(A) and the total cost of his completed work exceeded $25,000. Mr. Smith was, therefore, contracting and should have obtained a contractor's license. Since he did not have the required license, Tenn. Code Ann. § 62–6–103(c) limited his recovery from Ms. Winter to the actual documented expenses for the work that he could establish by clear and convincing proof.

## III.

### STATUTORY LIMITATION ON MR. SMITH'S COUNTERCLAIM

■ Mr. Smith also takes issue with the directed verdict dismissing his counterclaim against Ms. Winter because her payments for his work exceeded the total of the actual expenses he was able to document by clear and convincing proof. He asserts that the trial court misinterpreted Tenn.Code Ann. § 62–6–103(c) by considering more than just his unpaid expenses at the conclusion of the job. We find that the trial court properly interpreted and applied Tenn.Code Ann. § 62–6–103(c) to the facts of this case.

Ms. Winter made six progress payments to Mr. Smith between November 1989 and April 1990 totaling $131,670. Both Ms. Winter's and Mr. Smith's accountants testified that Mr. Smith's total documented expenses for his work on the Schandwin Farm project were less than these payments.[25] In light of the undisputed proof that Ms. Winter's payments exceeded Mr. Smith's documented expenses, the trial court determined that reasonable persons could only conclude that Mr. Smith's counterclaim must fail because he had already been paid more than his actual documented expenses.

Mr. Smith does not disagree with the factual conclusions but rather with the trial court's interpretation of Tenn.Code Ann. § 62–6–103(c). He asserts that the statute is not intended to give owners "the windfall of getting prior construction at cost" but rather to prevent unlicensed contractors from recovering any unpaid charges they cannot document by clear and convincing evidence. Mr. Smith has interpreted Tenn.Code Ann. § 62–6–103(c) too narrowly.

Prior to 1980, unlicensed contractors could not maintain breach of contract or quasi-contract actions against owners. *Farmer v. Farmer*, 528 S.W.2d 539, 542 (Tenn.1975). The Tennessee Supreme Court found the rule to be harsh, *Santi v. Crabb*, 574 S.W.2d 732, 734 (Tenn.1978), but continued to apply it with regard to claims against owners.

**24.** A general contractor is normally responsible for obtaining the necessary construction permits and for hiring and supervising the work of the subcontractors on the project.

**25.** For the purposes of Tenn.Code Ann. § 62–6–103(c), "actual documented expenses" include all documented expenses that an unlicensed contractor has actually incurred in connection with the work. A contractor need not have paid for an item in order for it to be treated as an actual documented expense. Mr. Smith's accountant determined that Mr. Smith's actual documented expenses on the Schandwin Farm project were $123,604 (including the unpaid bills of Anchor Rock and Gary Farmer Trucking). Ms. Winter's accountant set the figure at $126,111 (including the unpaid bills of Anchor Rock, Gary Farmer Trucking, and Dixie Earthmovers).

*Gene Taylor & Sons Plumbing Co. v. Corondolet Realty Trust,* 611 S.W.2d at 575–76. In 1980, the General Assembly mitigated the harsh effect of the rule by enacting Tenn. Code Ann. § 62–6–103(c).[26] We have examined the legislative debates and find that, like the words of the statute itself, they demonstrate that the General Assembly intended to permit unlicensed contractors to recover no more than the actual expenses they incurred in performing their work.

Mr. Smith now asserts that Tenn.Code Ann. § 62–6–103(c) should not be interpreted to permit an owner to set off its voluntary payments against the contractor's unpaid expenses. He relies on a decision by the Eastern Section of this court stating that Tenn. Code Ann. § 62–6–103(c) does not require "an unlicensed contractor to account ... for all amounts previously, voluntarily paid by the owner" and that the statute "does not authorize a recovery from the contractor for amounts voluntarily, knowledgeably and in the absence of fraud paid to him by an owner." *Nguyen v. Hart,* App. No. 03–A–01–9302–CH–00058, slip op. at 7–8, 18 T.A.M. 34-6, 1993 WL 291411 (Tenn.Ct.App. July 29, 1993), *perm. app. denied* (Tenn. Nov. 29, 1993).

 The statements in *Nguyen v. Hart* on which Mr. Smith relies must be viewed in the context of the Eastern Section's holding that Tenn.Code Ann. § 62–6–103(c) does not permit an owner to file suit against an unlicensed contractor to recoup payments exceeding the contractor's actual documented costs. The Eastern Section's decision, simply stated, is that the General Assembly did not intend to provide owners with a statutory recoupment cause of action when it enacted Tenn.Code Ann. § 62–6–103(c). It has no bearing on the extent of an unlicensed contractor's statutory right of recovery. Accordingly, we find that the trial court correctly determined that an unlicensed contractor does not have a claim under Tenn.Code Ann. § 62–6–103(c) where the owner has already paid more than the contractor's actual documented expenses.

**26.** Act of Mar. 17, 1980, ch. 652, § 5, 1980 Tenn.Pub.Acts 525, 529 (codified at Tenn.Code

## IV.

### THE INDEMNITY CLAIMS

Both parties sought indemnification for their payments to Anchor Rock and Gary Farmer Trucking. In addition, Mr. Smith requested indemnification for the legal expenses he incurred with regard to Anchor Rock's and Gary Farmer Trucking's claims against him. The trial court determined that Ms. Winter should indemnify Mr. Smith for his payments to Anchor Rock and Gary Farmer Trucking and for a portion of his legal expenses and denied Ms. Winter's indemnity claims. We have determined that neither Mr. Smith nor Ms. Winter is entitled to indemnification under the facts of this case.

### A.

 The concept of indemnification embodies principles of restitution and unjust enrichment. 2 George E. Palmer, *The Law of Restitution* § 10.6, at 410–11 (1978). It rests on two principles—that everyone should be responsible for their own wrongdoing and, therefore, that wrongdoers should be liable to persons who are required to pay damages that the wrongdoers should have paid. *Houseboating Corp. v. Marshall,* 553 S.W.2d 588, 589 (Tenn.1977); *Southern Coal & Coke Co. v. Beech Grove Mining Co.,* 53 Tenn.App. 108, 116, 381 S.W.2d 299, 302 (1963). To further these principles, indemnification requires the complete shifting of liability for loss from one person to another. *Eagle–Picher Indus., Inc. v. United States,* 846 F.2d 888, 892 n. 4 (3d Cir.1988); *Aetna Casualty & Sur. Co. v. Spartan Mechanical Corp.,* 738 F.Supp. 664, 678 (E.D.N.Y.1990); *Hennepin Drainage & Levee Dist. v. Klingner,* 187 Ill.App.3d 710, 135 Ill.Dec. 399, 401, 543 N.E.2d 967, 969 (1989); *Peters v. Mindell,* 159 Vt. 424, 620 A.2d 1268, 1270 (1992).

 Indemnity obligations are either express or implied. Express indemnity obligations arise from the contracts between the parties, and implied indemnity obligations, whether called equitable or contractual, are

Ann. § 62–6–103(b)).

imposed by law without the consent or agreement of the parties. Courts will impose an implied obligation to indemnify when the obligation is a necessary element of the parties' relationship, *Lusk v. Jim Walter Homes, Inc.*, 648 S.W.2d 935, 939 (Tenn.1983); *Houseboating Corp. v. Marshall*, 553 S.W.2d at 589, or when justice and fairness demand that the burden of paying for the loss be shifted to the party whose fault or responsibility is qualitatively different from the other parties. *Velsicol Chem. Corp. v. Rowe*, 543 S.W.2d 337, 339 (Tenn.1976); *see also Hydro–Air Equip., Inc. v. Hyatt Corp.*, 852 F.2d 403, 406 (9th Cir.1988); *Facilities Dev. Corp. v. Miletta*, 180 A.D.2d 97, 584 N.Y.S.2d 491, 495 (1992). In the absence of an express contract, an obligation to indemnify will be implied only if the party from who indemnification is sought breached a contract or engaged in some other related tortious conduct. *Burkert v. Petrol Plus of Naugatuck, Inc.*, 216 Conn. 65, 579 A.2d 26, 31 (1990); *First Am. Bank v. Woods*, 734 S.W.2d 622, 632 (Tenn.Ct.App.1987) (implied contractual indemnity based on negligence); *Stiver Mktg., Inc. v. Performance Business Forms, Inc.*, App. No. 01–A–01–9108–CH–00276, slip op. at 7, 16 T.A.M. 52–7, 1991 WL 254564 (Tenn. Ct.App. Dec. 4, 1991) (No Tenn.R.App.P. 11 appl. filed).

Indemnification issues arise frequently in construction litigation. Their impact can be significant because indemnification shifts the entire burden of loss or responsibility. They usually involve express contractual indemnity due to the widespread use of indemnification clauses in construction contracts, 3 Stein, *supra*, ¶ 13.17, but they may also involve implied indemnity claims and theories.

### B.

#### MR. SMITH'S RIGHT TO INDEMNITY FOR MATERIAL PAYMENTS

Mr. Smith would be entitled to indemnity from Ms. Winter were it not for Tenn.Code Ann. § 62–6–103(c). He had a contract with Ms. Winter entitling him to be paid for the work he performed at Schandwin Farm, and the stone delivered to the project between March 24 and April 12, 1990, enhanced the value of Ms. Winter's property. Ms. Winter breached the parties' contract by refusing to pay Mr. Smith's April 30, 1990 statement, and she would be unjustly enriched if she were permitted to keep the stone without paying for it.[27]

Mr. Smith's right to indemnity is, however, affected by Tenn.Code Ann. § 62–6–103(c). The common-law rule preventing any type of recovery by an unlicensed contractor was intended to prompt compliance with the licensing statutes. Tenn.Code Ann. § 62–6–103(c) provides a narrow exception to the common-law rule but limits an unlicensed contractor's recovery to its actual documented expenses. Permitting an unlicensed contractor to recover indirectly by indemnity what it cannot recover directly by contract would frustrate the rule's purpose. Thus, unlicensed contractors who have already received payments exceeding their actual documented expenses can recover no more from the owner under any theory or cause of action.[28]

### C.

#### MR. SMITH'S RIGHT TO INDEMNITY FOR LEGAL EXPENSES

Contractors entitled to indemnity from the owner for their actual documented construction expenses may also be entitled to be indemnified for their legal expenses incurred in litigation with third-parties. *See Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 340 (Tenn.1985). This right, like the contractor's other indemnity rights, is

---

**27.** Ms. Winter's progress payments covered all the rock delivered to the project through March 23, 1990. The rock deliveries between March 24 and April 12, 1990, were included in Mr. Smith's April 30, 1990 statement. Ms. Winter admits that she did not pay this statement.

**28.** For example, an unlicensed contractor who has received $125,000 in progress payments would not be entitled to recover from the owner if its actual documented expenses were equal to or less than $125,000. If, however, the unlicensed contractor documented $150,000 in actual expenses, then it would be entitled to recover up to $25,000 but no more.

affected by Tenn.Code Ann. § 62–6–103(c). Thus, an unlicensed contractor will be entitled to indemnity for its legal expenses in litigation with third parties only if the owner's conduct caused the litigation and if the owner's progress payments do not already exceed the contractor's actual documented construction and litigation expenses.

▉ Mr. Smith's right to indemnity for legal expenses extends only to the expenses related directly to defending Anchor Rock's and Gary Farmer Trucking's claims. While his attorney's affidavit states that he spent eighty-six hours on claims relating to Anchor Rock and Gary Farmer Trucking, most of this time also involved the disputes with Ms. Winter. Mr. Smith is not entitled to indemnity for the legal expenses relating to his dispute with Ms. Winter. Since his attorney's affidavit identifies only four hours devoted solely to Anchor Rock's and Gary Farmer Trucking's claims, Mr. Smith would be entitled, at most, to $600.[29]

Under the facts of this case, however, Tenn.Code Ann. § 62–6–103(c) prevents Mr. Smith from recovering any additional indemnity for his legal expenses. Ms. Winter has already paid Mr. Smith between $5,559 and $8,066 more than his actual documented construction expenses. The difference between her payments and Mr. Smith's actual documented expenses exceeds $600. Mr. Smith will not be entitled to indemnity from Ms. Winter as long as her payments exceed the amount of his actual documented construction and legal expenses.

### D.

#### Ms. Winter's Right to Indemnity

▉ Ms. Winter asserts that Mr. Smith should be required to indemnify her for any payments she may be required to make to Anchor Rock or Gary Farmer Trucking for the stone delivered to the project between March 24 and April 12, 1990. She bases her claim on her belief that she "is not contractually liable to pay any more money," that her payments to Mr. Smith are commensurate with the value of his work, and that she has not been unjustly enriched. We disagree.

Ms. Winter embarked on this ambitious project with little or no background in construction. She contracted with Mr. Smith for extensive portions of the work, but their informal oral agreement did not contain any terms that would have prevented disputes such as the one involved in this case. Furthermore, throughout the project, Ms. Winter exhibited more interest in prompt completion than in cost containment. Her changes in the scope of the work as the project progressed and her insistence that Mr. Smith work during inclement weather increased her costs. While Mr. Smith's communications with Ms. Winter were somewhat lacking, Ms. Winter, like any reasonable person, should have known that the costs were far in excess of her original expectations.

Ms. Winter never paid for the rock delivered to the project between March 24 and April 12, 1990. The cost for the rock and related services and materials was included in Mr. Smith's April 30, 1990 statement which Ms. Winter refused to pay. She had no grounds to refuse to pay for these services and materials because Mr. Smith had not breached the contract as of April 30, 1990, when Ms. Winter abruptly terminated him. Thus, her decision to terminate Mr. Smith without paying him caused Mr. Smith to be unable to pay Anchor Rock and Gary Farmer Trucking.

In addition, the rock delivered to the project between March 24 and April 12, 1990 unquestionably enhanced the value of Ms. Winter's property. If its benefit is not fully reflected in the estimated value of the completed project, it is due to the waste brought about by Ms. Winter's insistence that Mr. Smith continue the grading, road building, and show ring construction during wet weather. Since Ms. Winter has not already paid for the rock, requiring Mr. Smith to indemnify her should she be required to pay Anchor Rock or Gary Farmer Trucking would unjustly enrich her.

### V.

#### Gary Farmer Trucking's Right to a Lien

▉ Finally, Ms. Winter asserts that the trial court erred by awarding Gary Farmer

---

29. Mr. Smith's attorney charged $150 per hour for his services. 4 hours × $150/hour = $600.

Trucking a lien on her property. She argues that transportation charges are not lienable under Tenn.Code Ann. §§ 66–11–101 to –146 (1993). While persons who do no more than transport materials to a job site may not be entitled to a lien under Tenn.Code Ann. § 66–11–102(a), Gary Farmer Trucking is entitled to a lien because it performed work on the project.

### A.

Gary Farmer Trucking is owned by the same person who owns Anchor Rock. Its sole business is hauling the stone produced by Anchor Rock at its Maury County facility to Anchor Rock's customers. It was created as a separate entity in order to help Anchor Rock remain competitive by enabling Anchor Rock to avoid charging sales tax on the transportation cost of its products. This method of operation is common and accepted in the industry.

Anchor Rock's initial contract with Mr. Smith required it to supply the stone as needed and to deliver it to Schandwin Farm; therefore, the price quoted by Anchor Rock included the delivery charges. After Anchor Rock began performing, Mr. Smith asked the drivers delivering the rock to perform other work in addition to simply delivering the stone. This work included distributing and compacting the stone used on the road and in the show rings. Since the delivery trucks were spending more time on the project than they normally would, Mr. Smith agreed to pay an additional $.25 per ton for the stone.

### B.

The courts strictly construe the lien statutes when determining whether a claimant is among the class of persons entitled to a lien. *Arnstein Realty Co. v. Williams,* 163 Tenn. 69, 74, 40 S.W.2d 1007, 1008 (1931); *Richardson v. Lanius,* 150 Tenn. 133, 144, 263 S.W. 799, 802 (1924). Accordingly, we will not extend these statutes by construction to cover persons who have not been plainly included. *Pillow v. Kelly,* 155 Tenn. 597, 599, 296 S.W. 11, 12 (1927). At the same time, we will not construe them so narrowly that we frustrate their intended purpose. *See Nicks v. W.C.*

*Baird & Co.,* 165 Tenn. 89, 93–94, 52 S.W.2d 147, 148 (1932).

### C.

Gary Farmer Trucking claims that it is entitled to a lien under Tenn.Code Ann. § 66–11–102(a). The statute provides, in part, that

[t]here shall be a lien . . . in favor of the contractor, mechanic, laborer, founder or machinist, who does the work or any part of the work, or furnishes the materials or any part of the materials . . . and in favor of all persons who do any portion of the work or furnish any portion of the materials for such building. . . .

Tenn.Code Ann. § 66–11–101(8) defines a "laborer" as "any person who, under properly authorized contract, of any degree of remoteness, personally performs on the site of the improvement labor for improving real property."

Gary Farmer Trucking would not be a "laborer" or a "person doing any portion of the work" if it were simply delivering Anchor Rock's stone to the job site. Delivering materials is not work on the site of the improvement. However, Gary Farmer Trucking's activities relating to the spreading and compaction of the stone was work on the site of the improvement, and so these activities qualify it as a laborer and as a person doing a portion of the work. This work was not merely incidental to Gary Farmer's contract since it warranted an increase in the final cost of the delivery of the stone. Accordingly, the trial court correctly determined that Gary Farmer Trucking was entitled to a lien against Ms. Winter's property.

### VI.

In summary, we have (1) affirmed the summary judgment finding that Mr. Smith was contracting on the Schandwin Farm project without the required license, (2) affirmed the directed verdict dismissing Mr. Smith's counterclaims against Ms. Winter, (3) reversed the judgment that Mr. Smith is entitled to be indemnified by Ms. Winter for his payments to Anchor Rock and Gary Farmer Trucking and for his legal expenses, (4) af-

firmed the judgment that Ms. Winter is not entitled to indemnity from Mr. Smith, and (5) affirmed the judgment awarding Gary Farmer Trucking a lien against the Schandwin Farm project.

We remand the case to the trial court for whatever further proceedings may be required, and we tax the costs of this appeal, in equal proportions, to Helene Winter and her surety and to Tommy Smith and his surety, for which execution, if necessary, may issue.

TODD, P.J., M.S., and CANTRELL, J., concur.