# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 14, 2010 Session

## TRIANGLE AMERICAN HOMES v. SAMUEL B. HARRISON, ET AL.

**Appeal from the Chancery Court for Loudon County**
**No. 10889      Frank W. Williams, III, Chancellor**

---

### No. E2009-01954-COA-R3-CV-FILED-OCTOBER 13, 2011

---

In this indemnity case, Jere Krieg ("Builder"), through Triangle American Homes, Inc., initially filed a complaint for attachment and damages against Samuel and Lauren Harrison (collectively "the Harrisons") relating to the construction of a modular home. When the Harrisons filed a counterclaim, arguing that Builder had failed to perform pursuant to their contract, Builder brought a third-party complaint against All American Homes of Tennessee, LLC ("Seller"), alleging that Seller should indemnify Builder. Builder and the Harrisons entered into a settlement agreement. In the remaining suit for indemnification, Seller argued that Builder was not entitled to indemnity because the damages and losses sustained by Builder were a result of Builder's actions. Following a bench trial, the trial court held that Builder was entitled to damages in the amount of $45,000 and attorney fees in the amount of $45,000, for a total award of $90,000. Seller appeals. We modify the award of attorney fees to $18,084 and affirm the decision of the trial court in all other respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, J., joined.

A. Wayne Henry (at trial and on appeal), Loudon, Tennessee, and Stephanie L. Nemeth (on appeal) and Jason W. Cottrell (at trial), Mishawaka, Indiana, for the appellant, All American Homes of Tennessee, LLC.

Jack M. Tallent, II, Knoxville, Tennessee, for the appellee, Triangle American Homes, Inc.

# OPINION

## I. BACKGROUND

In 2003, Builder entered into an agreement with Seller, whereby Builder was allowed to purchase, install, resell, and service Seller's modular homes.[1] Pursuant to the agreement, Builder was responsible for "all obligations arising from the excavation and land condition, backfilling and grading, footings, basement floor, crawlspace, foundation walls, HVAC system, and any and all additional work and/or material not specifically set forth and agreed to be provided by [Seller]." Builder also had the option of purchasing additional finishing services, including an interior and exterior trim out, which were necessary because the areas where the sections joined, referred to as the marriage line, were not completed. If Builder purchased an interior trim out, Seller agreed to complete the wall openings at the marriage line; install doors at the marriage line, base trim, flooring cutbacks at door openings, and loose light fixtures; adjust the interior and exterior doors; and touch-up the walls. If Builder purchased an exterior trim out, Seller agreed to install shutters, channels, trim, wood, siding, corners, blocks, support boards, panels, roofing edges, covers, and windows. If Builder did not purchase these services, he was responsible for performing these services.

In 2005, the Harrisons visited Builder's office and displayed interest in purchasing a modular home. The Harrisons inquired about the Kingston unit, which was composed of two modules, and Builder subsequently discovered that a previously manufactured Kingston unit was available. Builder informed them that a Kingston unit that had been built for another customer was available and told them that if they purchased that unit, they could save money. Builder did not inform them that the unit was commonly referred to as a yard unit because it had been manufactured one year ago and had been sitting outside on wood cribbing.

When Builder contacted Seller, he was given a "quick quote sheet," reflecting the price for the unit itself and additional options. The quote sheet reflected a total price of $91,573 for the potential transaction, including delivery, crane setting, and an exterior and interior trim out of the unit. Approximately two months later, the Harrison gave Builder a $5,000 deposit for the unit. Shortly thereafter, Builder sent Seller a $2,000 deposit for the unit. The order was subsequently confirmed in an order sheet, which reflected Seller's receipt of Builder's deposit, the base price for the unit, and the cost for an exterior and interior trim, delivery, and crane setting of the two modules, with applicable discounts. The order sheet reflected a total price for the transaction of $72,000, less the deposit, and

---

[1]These homes were composed of separate modules that are manufactured inside Seller's plant. Once the modules were manufactured, they were delivered to a permanent foundation, where a crane set each module in its place. The modules were then secured to the foundation and fastened together.

instructed Builder that if the unit was not delivered and set within 45 days, then Seller may charge storage fees. Approximately one week later, Builder and the Harrisons executed a contract providing for the purchase of the unit and additional site buildings, for a total price of $173,376. One month later, Builder began work on the foundation.

On September 7, 2005, Seller sent Builder a letter, which provided, in pertinent part,

This letter is to inform you that [the Harrison] unit ha[s] exceeded the 45-day delivery requirement. We will need to establish a firm delivery date within five days or the units will become open and available to our builder network. Please contact our transportation department so we can schedule delivery to take place in the next thirty days.

These units are sold "as is" and will be delivered and crane set per our guidelines. No interior or exterior trim out is available for th[is] unit.

Several days before the unit was scheduled to be delivered, Seller sent Builder a "Yard Inventory Release," which provided that the purchase price of the unit had been discounted and that in consideration for the discount, the house was being sold "as is" with only a Bonded Builders Warranty, not a manufacturer's warranty as to condition or value. The document also provided that the fees for delivery and set of the modules at the site location were in addition to the newly discounted price. Pursuant to the document, Builder agreed to inform the purchaser that the unit was sold without a manufacturer's warranty and "perform all necessary warranty work [and] assume all liability for any warranty work." Seller told Builder that they would not deliver the unit until Builder signed the document. Builder signed the document and returned it to Seller.

On October 3, 2005, Seller attempted to deliver and set the modules. However, the foundation was not ready, and the crane that had been ordered did not have enough counterweights. The next day, Larry Lane, Seller's plant manager, asked Builder to sign a waiver of responsibility form because he believed the way in which the company driver had to bring the unit in was "unsafe." After Builder signed the form, Rodney Sculley, Seller's company driver,[2] then drove the first module onto the site without incident other than some "teeter[ing]." However, as he was driving the second module in, the left side of the module leaned, tipped, and eventually rested on a pear tree in the driveway. Mr. Sculley and others present had to use a bulldozer to right the module into the proper position. Once the module was close enough to the foundation, the crane attempted to lift the module. As the crane was lifting the module, a floor joist broke. The workers discovered that a lag bolt, which

---

[2]Mr. Sculley testified at trial that he believed they used the best pathway to deliver the unit.

-3-

connected the module to attachments on the trailer, had not been removed. The force of the crane had freed the module from the trailer, tearing the floor joist in the process. After the modules were set, Builder and his employees began the process of completing the interior and exterior trim outs and finishing the additional site buildings. Progress was slow, and Builder had to change the estimated move-in date for the Harrisons a number of times.

The Harrisons were finally scheduled to move into the house on February 10, 2006. When the Harrisons arrived, Builder was not present. Shane Roberts, one of Builder's employees, arrived two hours later. Shortly after Mr. Roberts arrived, Builder called and told Mr. Roberts to gather the tools and leave the premises because the Harrisons owed Builder money. Mr. Roberts left without taking the tools. When the Harrisons entered their new house, they discovered that areas remained unfinished and that projects had not been completed as they requested. The Harrisons refused to let anyone associated with Builder return to remedy the problems with the house. A few weeks later, the Harrisons spoke with one of Seller's representatives, David Kurth, who told them that the modules should have been brought in by a different route, that they had bought a yard unit, that the unit was sold "as is," and that they did not have the one-year manufacturer's warranty as they had been told. However, at some point, Michael Elliot, Seller's customer service technician, repaired some of the major drywall issues and delivered some missing windows.

Builder filed suit for amount due pursuant to the contract and the retention of its tools, and when the Harrisons counterclaimed, Builder filed a third-party complaint against Seller. The Harrisons filed a cost bond into the court in the amount of $23,423.96, and following a settlement agreement between Builder and the Harrisons, the money was disbursed among the parties. In exchange for releasing their claims against Builder, the Harrisons paid Builder $1,400 and retained the rest of the money, less 5 percent of the earned interest that was given to the Clerk and Master. The trial regarding the suit between Builder and Seller was held approximately one year later.

At trial, Jim Richards testified that he was Seller's divisional sales manager of the Springfield, Tennessee division until his position was eliminated when David Kurth became the interim general manager. He said that when Builder began working with Seller, Robert Nordass was the sales representative that handled Builder's area. Builder purchased four units from Seller, including three yard units in Spring 2005. Mr. Richards explained that the yard units Builder purchased came with an interior trim out because the service made the purchase of the units more attractive and because the units could not be inspected until the home was being set. In addition to the interior trim out, Builder requested an exterior trim out. Mr. Richards's superior approved the transaction with the additional service.

Mr. Richards asserted that all of Seller's homes, including yard units, "were sold with a one-year warranty against manufacturer's defects and workmanship and materials" in addition to a Bonded Builders Warranty, that provided warranty coverage for nine years starting after the one-year warranty expired. He admitted that Builder's quick quote sheet did not mention a manufacturer's warranty but explained that the warranty "would not have been something that [he] would have brought up because every home had a warranty on it."

David Kurth testified that when he arrived at the Springfield plant in February 2005, he attempted to maintain and build the business but that the plant was ultimately closed in September. He created the yard inventory release forms and established a practice and procedure for selling the yard units. He asserted that the forms were created before Builder bought the yard unit in June 2005 but acknowledged that Builder was not asked to sign a form until after he had placed his order. When asked why the customer service manual did not differentiate between yard units and other units, Mr. Kurth opined,

> It was the intent of the company to never have a yard unit. If the [company] procedures had been followed, there would be no yard units. It's because procedures were overlooked, because they weren't followed, because the people at the Tennessee plant before I got there did not follow procedures, that we ended up with yard units to begin with. So this entire [manual] was written under the premise that such a thing did not exist. Unfortunately, it did.

He insisted that the portion of the manual that referred to the one-year warranty only applied to newly constructed homes and that he did not think there was "anything in th[e] manual that sp[oke] directly to the sale of existing inventory of previously built homes."

Relative to the yard inventory release that Builder signed, Mr. Kurth stated that when Builder did not accept delivery within 45 days of the sale, he had the ability to cancel the original order and keep the deposit. He conceded that if the units had been delivered within 45 days of the June 2005 order, then they would have been obligated to follow the terms of that document. He acknowledged that such a provision was not included in the original contract and that the yard inventory release and a receipt form[3] that he also developed were the only documents evidencing Seller's ability to cancel the order and keep the deposit. He admitted that when he told Builder that he had to sign the yard inventory release or risk forfeiture of the unit, he knew that the foundation for the unit had already been built.

Mr. Kurth testified that while the Harrisons did not receive the one-year manufacturer's warranty, they received a Bonded Builders Warranty, which "was an

---

[3]This new receipt was never given to Builder.

insurance policy of sorts that was available to provide additional coverage for structural issues for a period of ten years after a builder had constructed" the home. Regarding the foundation of the home, Mr. Kurth explained that the foundation was

> like a tire for a car . . . that can fit many cars as long as the rim of that particular car accepted that size tire. The foundation is a foundation. And as long as what is placed on that foundation fits the size and loading requirements that the foundation was designed to accommodate, any style of home, if you will, or any appearance of home could be placed on that foundation.

Regarding the trim out services, he said that an interior trim out could be performed in less than a day and that an exterior trim out of the particular model at issue could take four days.

Builder testified that he was interested in contracting with Seller because he wanted to develop a construction training program. He thought entering the modular home business would allow him to mentor his trainees as they completed specific, "individual tasks" because the home was already partially constructed by the manufacturer. He chose to contract with Seller because they offered services like completing the trim outs.

Relative to his agreement with Seller, Builder told Mr. Richards that he thought he could resell three yards units. Builder asked Mr. Richards if Seller could include the crane setting and the interior and exterior trim outs because he did not want his trainees to complete those services. After Builder negotiated for the units, he secured a contract with the Harrisons and sent Seller a deposit for the units. He asserted that the foundation for the Harrison home was ready in September.

When Builder contacted Seller to set a delivery date, he was given the yard inventory release and told that if he did not sign the release, he would not receive the unit. At first, he made changes to the document and faxed the release back to Seller. He admitted that after Seller changed a few of the provisions, he signed the revised release but asserted that he had to sign the release to ensure delivery of the unit. He admitted that he could have cancelled the contract with the Harrisons but explained that he could not just order another unit because the plumbing and foundation had already been set for that particular unit and because Seller was in the process of shutting down the plant. Prior to the delivery of the units, he had a dirt road built for the trailers to cross a small ravine. When the delivery crew arrived, he was presented with another document, the waiver of liability form, and told that he had to sign the document before they would deliver the units.

Builder acknowledged that Seller performed their crane setting obligations but said that they did not complete the interior and exterior trim out. He claimed that when Seller's

crew was raising the roof, they did not "put the proper protection underneath it," causing damage to the roof. Also, the crew did not adjust the posts where the house was set, and the shingles on the roof were damaged. Builder testified that he completed the tasks that Seller had agreed to complete and that he also had to fix several of Seller's mistakes. He said that progress was slow because he did not have a proper crew.

Relative to his indemnity claim, Builder introduced a document, providing that he had suffered damages in the amount of $140,196.01, including his loss from the settlement agreement with the Harrisons, the additional work that he had to perform to complete the construction of the house when Seller refused to perform the trim outs, the reflective salaries he had to pay his employees to complete the work, and the cost of the repairs that he performed. He asserted that he also had to pay $2,500 for the crane setting of the modules and that he never received the rebate that was discussed when he ordered the unit.

Susan McCullough testified that she had worked for Seller as a sales manager and that Mr. Richards was her supervisor. She asserted that all homes, including yard units, came with two warranties – a one-year warranty and a warranty that covered years two through ten. When shown a quote sheet for a yard unit, she acknowledged that the sheet reflected that the house was sold "as is" but explained that the term meant that builders could not change the existing cabinetry, floor covering colors, carpet colors, or tub and commode colors. Likewise, Mr. Lane said that the yard units were sold "as is," meaning that they would not change or fix anything, other than to remove mold. However, he insisted that in 2005, the company no longer offered the trim outs as a service and that the "guys who were on the trim out crew were moved to other sections."

Mr. Nordass testified that prior to the time that any of the yard units were sold, Seller stopped offering the trim outs as a service. He asserted that once a builder placed a deposit on a yard unit, he or she had 45 days to schedule delivery or the unit became "open" and could be sold to another builder. He spoke with Builder directly after Builder continued to suggest that the unit was purchased with an interior and exterior trim out and a warranty. He insisted that he told Builder that the trim out services were not an option and that the unit came without a warranty. He opined that Seller had never offered the one-year manufacturer's warranty for the yard units. Connie Traughber, Seller's service manager, confirmed Mr. Nordass's testimony regarding the trim out services.

Two well-qualified enigineers, James Quarve and Todd Duncan, testified regarding their inspection of the Harrison home. Mr. Quarve noticed nail pops, which were caused by either moisture in the wood or by the setting of the unit as it was picked up and placed on the foundation. He examined the floor joist that had been split and repaired by placing another piece of lumber beside the broken joist. He asserted that in addition to the broken floor joist,

there could have been other damage to the home that occurred when one of the modules remained attached to the trailer as the crane attempted to lift that module. Mr. Duncan observed cracks in the walls, nail pops, high spots on the main floor, caused by improper placement of a post and improper measurement of studs that composed a wall under the stairs. Mr. Duncan opined that these high spots could cause cracks in the Sheetrock and could affect the operation of windows and doors. He found that one half of the marriage wall was unsupported because of the placement of the stud wall.

Mr. Harrison said that Builder's employees, Bob Campbell and Mr. Campbell's son, began construction of the foundation in August 2005 but that Mr. Campbell stopped working for Builder "not long after the house was set." He stated that Builder brought other workers to work on the house once Mr. Campbell quit. He eventually told Builder he thought the construction was progressing "at a very slow pace." He thought if Builder had an actual crew, the house would have been ready within the first projected time frame given the adequate weather for the first three to four months of construction. Likewise, Mrs. Harrison asserted that Builder kept changing their move-in date, and when they finally moved in, Builder was not present and had not finished the items he had promised to finish.

Mr. Harrison asserted that while Seller was responsible for delivering and setting the modules, Builder was responsible for constructing the foundation, the garage, the breezeway, the driveway, and the second story of the house. Mr. Harrison found numerous problems with the house itself, the attic, the garage, and the breezeway. Relative to the problems with the outside of the house, Mr. Harrison opined that the shingles were broken in certain areas, that there were two ridge lines that ran across the back of the house, that siding had come off the house and had not been properly cut, that there were two different colors and textures of siding on the house, and that the sewer system had not been properly vented through the roof. Relative to the problems within the house, he testified that there was mold in the master bedroom, that some of the kitchen cabinets were damaged, that the kitchen window did not work, that the lights above the kitchen sink were not centered, that insulation had not been installed in some places and was improperly installed in other places, that panels of Sheetrock had separated, that numerous nail heads and screws had popped through the Sheetrock upstairs, that there were stress cracks around all of the windows and doors, and that the basement leaked. Relative to the problems with the second story, he said that the upstairs windows did not work, that the plumbing in the upstairs bathroom was faulty and ultimately ruined the ceiling in the first-floor living area of the house, and that the floor trusses on the second floor appeared to have protruded through the ceiling of the main living area. Relative to problems with the garage, he believed that the attic in the garage was not installed properly, the garage floor was sunk in the middle and cracked all the way around, and that the back wall in the garage was leaning. When he told Builder about all of these issues, Builder promised to "deal" with Seller. Mr. Harrison claimed that the majority of his

problems were with the construction of the site, not the modules and that he did not believe Seller was really at fault. He said that Builder initially told them that they would receive a warranty from Seller and that he would also provide a warranty that would "match or exceed" Seller's warranty. He said that Builder never told them that they were purchasing the unit "as is."

James Deatherage, a partner in the forensic engineering firm of Construction Engineering Associates, testified that he inspected the modular home built for the Harrisons and drafted a report detailing the repairs that needed to be made and the cost of the repairs, totaling $84,061.91. He first visited the home in March 2006 and found "nail pops, water intrusion areas, framing issues, and foundation issues in the basement area." He also inspected the garage, exterior siding, trim, and soffits. He visited the house again in November 2006 for a subsequent inspection before finalizing his report. His report detailed repairs needed for the garage and the interior and exterior of the house and the work that had not been completed by Builder. He believed that the repairs did not relate to the manufactured portion of the home but that some of the repairs related to the damage that occurred when the unit turned on its side during delivery. He explained that when the unit tipped and leaned into the tree and was then subsequently lifted back to its position on the trailer, the unit underwent residual stresses that caused nail pops and the inoperable windows. He opined that the subsequent breaking of the lag bolt that attached the second module to the connectors on the trailer would not have caused any damage, other than the break in the floor joist in the kitchen area. He doubted that the crane operator would have noticed the event.

On cross-examination, Mr. Deatherage said that the twisting that occurred when the unit fell into the tree would have been ten times more than the twisting that could have occurred when the lag bolt was improperly removed. He admitted that improper shingling of the entire house was not part of the stick built portion but was part of the manufactured portion of the house. He explained that the damage to the shingles was attributed to the long-term bending that occurred while the unit sat outside. He stated that the quality of the siding was "unacceptable from a construction standpoint" and that repairs needed to be made to the siding and the facia metal. He said that the crown molding and the plumbing in the upstairs needed to be repaired and that a downstairs column needed to be reinstalled.

Following the conclusion of the trial and the above presented testimony, the trial court found that Builder had "contracted for and was offered exterior and interior trim out" and that the unit came with a one-year manufacturer's warranty, despite Seller's protests that yard units did not include such a warranty. The court stated that it did not believe that there was any distinction, for warranty purposes, between a newly manufactured unit and a yard unit. The court explained that the yard inventory release form did not remove the warranty because the form was drafted by Mr. Kurth in the hopes of minimizing Seller's liability and signed

after Builder had already bought the unit and because Builder signed the form under duress. The court found that the problems that occurred during delivery were attributed to Seller and that the waiver of responsibility form did not remove Seller's liability. The court awarded Builder with $45,000, explaining that the amount covered the sum paid to the Harrisons pursuant to the settlement agreement and Builder's lost profit from the sale and construction of the modular home resulting from Seller's breach of contract. The court then awarded Builder with $45,000 in attorney fees, reflecting attorney fees accrued in his defense of the Harrison counterclaim and in his pursuit of the indemnity claim against Seller.

## II. ISSUES

We consolidate and restate the issues raised by Seller as follows:

A.   Whether the trial court erred in holding that Builder was entitled to indemnification from Seller.

B.   Whether the trial court erred in awarding Builder with attorney fees pursuant to the contract between Builder and Seller.

## III.  STANDARD OF REVIEW

On appeal, we review the decision of a trial court sitting without a jury de novo upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV.  DISCUSSION

### A.

Seller contends that Builder is not entitled to indemnification because Builder did not sustain a loss but actually received money as a result of the settlement with the Harrisons. Seller also asserts that Builder cannot recover from Seller because Builder was at fault for the problems with the Harrison house, as evidenced by the Harrison complaint. Builder

-10-

responds that he suffered an actual loss through his settlement with the Harrisons because less the $1400 he received, he did not receive the balance due pursuant to his contract and because he had to forego recovery of the additional funds he expended, which were in excess of $100,000. Builder also asserts that his losses were not a result of his own wrongful conduct because some of the claims raised by the Harrisons resulted from Seller's negligence, actions, breach of contract, and breach of warranty as the manufacturer of the modules.

"The right to indemnity rests upon the principle that everyone is responsible for the consequences of his own wrong, and, if another person has been compelled to pay the damages which the wrongdoer should have paid, the latter becomes liable to the former." *Southern Coal & Coke Co. v. Beech Grove Min. Co.*, 381 S.W.2d 299, 302 (Tenn. Ct. App. 1963). "Indemnity obligations are either express or implied. Express indemnity obligations arise from the contracts between the parties, and implied indemnity obligations, whether called equitable or contractual, are imposed by law without the consent or the agreement of the parties." *Winter v. Smith*, 914 S.W.2d 527, 541-42 (Tenn. Ct. App. 1995). "Indemnification issues arise frequently in construction litigation." *Id.* at 542. Moreover, "[t]heir impact can be significant because indemnification shifts the entire burden of loss or responsibility." *Id.*

Citing *Stiver Mktg., Inc. v. Performance Bus. Forms, Inc.*, No. 01-A-019108CH00276, 1991 WL 254564, at *4 (Tenn. Ct. App. Dec. 4, 1991), Seller asserts that Builder cannot recover because he never suffered a loss. While we acknowledge that "[g]enerally, the right to sue for indemnity for damages resulting from the negligence, misfeasance, or malfeasance of another accrues only when payment has been legally made by the indemnitee," we believe that the loss sustained in this case occurred in the form of the settlement between Builder and the Harrisons. *Id.* Indeed, the loss may take the form of "payment, settlement, or through the injured party's obtaining an enforceable judgment." *Id.*

In this case, Builder sustained a loss in the amount of $22,023.96, reflecting the amount the Harrisons retained less the amount given to Builder pursuant to the settlement agreement between Builder and the Harrisons. Additionally, the indemnity provision at issue here provides, in pertinent part,

> Seller will defend, indemnify and hold Builder harmless from and against any claim by the purchaser or occupant of a home, to the extent such claim is based on a failure of the home to meet the *specifications of the order* placed with and accepted by Seller, and to the extent such claim is based upon an alleged breach of Seller's warranty. . . . Each party's indemnity shall include . . . *any*

-11-

*costs or expenses* reasonably incurred to perform the other party's obligations
if that party fails or refuses to perform them without good cause.

(Emphasis added).

Pursuant to the contract in the form of the order between the parties, Seller agreed to perform the interior and exterior trim out. Seller refused to perform this service, and Builder was tasked with performing the service. Builder was also tasked with repairing the damage resulting from Seller's delivery of the modules. Indeed, the second module was damaged as Seller delivered the module to the foundation and as the module was lifted from the trailer. While testimony at trial indicated that Seller repaired some of the major drywall issues caused by the delivery and setting of the modules, no testimony was presented that Seller adequately repaired the damage resulting from its failure to meet the specifications of the order and its failure to perform pursuant to the one-year manufacturer's warranty. Like the trial court, we believe the unit came with a one-year manufacturer's warranty and that Seller refused to perform the services implicated by the warranty and the services contracted for in the order. We also believe that the subsequent attempt by Seller to amend the order by changing the terms and removing the warranty shortly before the unit was to be delivered was ineffective and that the waiver of responsibility form that was presented at delivery was also ineffective. With the above considerations in mind, we conclude that Builder was entitled to indemnification from Seller and that an award of $45,000 was sufficient and appropriate to cover the loss sustained by Builder in the settlement agreement with the Harrisons and the costs and expenses incurred to perform Seller's obligations after Seller refused to perform its obligations without good cause.

B.

Seller contends that the contract does not require payment of attorney fees when Builder was at fault for the problems with the Harrison home. Seller alternatively asserts that pursuant to the language in the contract, Builder is only entitled to recover attorney fees relating to his defense of the Harrison counterclaim and is not entitled to recover any attorney fees relating to his pursuit of the indemnity cause of action. Builder responds that he is entitled to the amount of attorney fees awarded pursuant to the express provisions of the contract. Builder alternatively responds that if he is not entitled to the full amount of attorney fees awarded, he is "clearly" entitled to the attorney fees accrued as a result of his defense against the Harrison counterclaim.

Tennessee follows the American Rule which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000); *accord Taylor v. Fezell*, 158

S.W.3d 352, 359 (Tenn. 2005). "Under the American [R]ule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American [R]ule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *Taylor*, 158 S.W.3d at 359; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998)). "[A]s a general principle, the American [R]ule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case." *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008).

As relevant to this case, attorney fees "are recoverable under an express indemnity contract if the language of the agreement is broad enough to cover such expenditures." *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985). However, recovery under an implied indemnity theory also includes attorney fees and "other litigation costs which have been incurred by the indemnitee in litigation with a third party." *Id.* at 338. This case involved an express indemnity contract that included an attorney fees provision. Consequently, we must determine whether the provision in the contract was broad enough to include the trial court's award of attorney fees. The cardinal rule of contract interpretation is that the court "must attempt to ascertain and give effect to the intent of the parties." *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005). In attempting to ascertain the intent of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App. 1996). The "court's initial task in construing a contract is to determine whether the language of the contract is ambiguous." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). Where the language of a contract is clear and unambiguous, its literal meaning controls the outcome of the dispute. *Id.* at 890.

The provision for attorney fees provides, in pertinent part,

Seller will defend, indemnify and hold Builder harmless from and against any claim by the purchaser or occupant of a home, to the extent such claim is based on a failure of the home to meet the specifications of the order placed with and accepted by Seller, and to the extent such claim is based upon an alleged breach of Seller's warranty. . . . Each party's indemnity shall include reasonable attorney's fees to defend against such a claim, *and* any *costs* or *expenses* reasonably incurred to perform the other party's obligations if that party fails or refuses to perform them without good cause.

(Emphasis added). A literal reading of the provision reflects that the parties clearly and unambiguously contracted for an award of attorney fees accrued as a result of Builder's

defense against a third-party claim. Thus, this provision supported an award of attorney fees accrued as a result of Builder's defense against the Harrison counterclaim after Seller refused to perform pursuant to the contract and refused to honor its one-year manufacturer's warranty. This provision did not support an award of attorney fees accrued as a result of the suit between Builder and Seller. While Builder attempts to use the "costs and expenses" portion of the sentence to argue that he was entitled to attorney fees relating to his suit against Seller, we do not believe that the clear and unambiguous language of the provision is broad enough to include an award of attorney fees under those circumstances. The drafter of the contract clearly separated the award of attorney fees from the award of costs and expenses incurred to perform the other party's obligations. Any other reading of the contract would ignore the literal meaning of the provision. Accordingly, we conclude that Builder's award of attorney fees should be reduced to the amount of $18,084, which reflects Builder's claim for attorney fees accrued in its defense of the Harrison counterclaim. The judgment of the trial court should be modified to reflect that amount.

## V. CONCLUSION

The judgment of the trial court is affirmed as modified, and the cause is remanded for such further proceedings as may be necessary. Costs of this appeal are taxed to the appellant, All American Homes of Tennessee, LLC.

_____
JOHN W. McCLARTY, JUDGE